UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

REINHART FOODSERVICE LLC,

                Appellant,

    v.                                          Case No. 21-cv-1027-bhl

DAVID S SCHLUNDT, et al,

                Appellee.

## ORDER REVERSING AND REMANDING CASE

Under Bankruptcy Code Section 727(b), a Chapter 7 debtor's bankruptcy discharge eliminates the debtor's liability for "all debts that arose *before* the date of the order for relief." 11 U.S.C. §727(b) (emphasis added). This appeal concerns the application of that provision to liabilities arising *after* the bankruptcy but based on the debtor's *pre*-bankruptcy promise to guarantee the obligations of a third party. The bankruptcy court concluded it was bound by the Seventh Circuit's decision in *Saint Catherine Hospital of Indiana, LLC v. Indiana Family and Social Services Administration*, 800 F.3d 312 (7th Cir. 2015) to hold the debts in this case were discharged even though it is undisputed that the transactions that gave rise to the debts did not occur until four years *after* the debtor filed his joint bankruptcy petition. *In re Schlundt*, No. 14-20454-beh, 2021 WL 3700401, at *2 (Bankr. E.D. Wis. Aug. 19, 2021). Because that conclusion rests on an overbroad reading of *Saint Catherine* and is contrary to the plain terms of the Bankruptcy Code, this Court will reverse and direct the bankruptcy court to enter declaratory judgment in favor of Reinhart.

## BACKGROUND

From 2003 through 2018, David Schlundt was the owner and sole member of The Refuge, LLC, a restaurant in Antigo, Wisconsin. (ECF No. 2-2 at 29; ECF No. 2-3 at 56.) In that capacity, on September 11, 2003, Schlundt signed a supply agreement (Agreement) with Reinhart FoodService LLC (Reinhart). (ECF No. 2-3 at 56.) Under the Agreement, Reinhart agreed to provide Schlundt's restaurant with goods and services subject to enumerated conditions, including payment terms to be set by Reinhart's credit department. (*Id.* at 34-35.) Among other things,

payments not made in accordance with those terms would be subject to a delinquency charge. (*Id.* at 35.)

Within the same document, Schlundt also signed an "Individual Personal Guaranty." (*Id.*) Under this provision, Schlundt agreed that in exchange for Reinhart's extension of credit to his restaurant, he would "personally guarantee prompt payment of any obligation" of The Refuge to Reinhart "whether now existing or hereinafter incurred." (*Id.*) He further promised "to pay on demand any sum which is due . . . whenever [The Refuge] fails to pay same." (*Id.*) And he confirmed that the guaranty was "absolute, continuing, and irrevocable." (*Id.*)

Ten years after making this commitment, Schlundt and his wife Jennifer filed a joint petition for personal bankruptcy under Chapter 7. (ECF No. 2-2 at 6-8.) In the filings that accompanied their petition, the Schlundts did not identify Reinhart as a creditor. (*Id.* at 9-61.) They did not list Reinhart on their Schedule F "List of Creditors Holding Unsecured Nonpriority Claims," and they similarly omitted it from the required list or "matrix" of creditors, which serves as the basis for identifying who receives notice of filings in the bankruptcy case. (*Id.* at 22-26; ECF No. 2-3 at 42.) As a result, Reinhart did not receive official notice of the bankruptcy. (ECF No. 2-3 at 58.)

At the time of the bankruptcy filing, The Refuge owed Reinhart approximately $10,000 for sales of goods and services under the Agreement. (*Id.* at 40.) The record is unclear whether that amount was overdue as of the petition date. It is also unclear whether The Refuge had "'fail[ed] to pay'" the debt sufficient to trigger Schlundt's liability under the Personal Guaranty.[1] (ECF No. 9 at 9-10.) In any event, on April 11, 2014, the Chapter 7 trustee administering the bankruptcy issued a Report of No Distribution, confirming that the trustee had completed his administration of the debtors' estate and determined there were no non-exempt assets available to make distributions to creditors. (ECF No. 2-2 at 3-4.) Ten days later, on April 21, 2014, the Schlundts received their bankruptcy discharge, and their case was then closed. (*Id.* at 4.)

Schlundt continued to operate The Refuge throughout the bankruptcy proceeding and indeed for several years thereafter. (ECF No. 2-3 at 40.) He also continued to purchase supplies for the restaurant from Reinhart under the Agreement. (*Id.*) Then, in the summer of 2018, he closed the restaurant. (*Id.*) At the time of its closure, The Refuge owed Reinhart $36,839.62 for

---

[1] The record confirms that, at some point, The Refuge itself satisfied the $10,000 debt, and it is not at issue in this appeal. (ECF No. 9 at 10.)

goods and services purchased earlier that Spring, from March to May 2018. (*Id.*) When The Refuge failed to pay this outstanding sum, Reinhart demanded payment from Schlundt under his Personal Guaranty. (*Id.*) He refused to pay, citing his 2014 bankruptcy discharge. (ECF No. 4 at 6.)

Rather than risk sanctions for trying to collect a potentially discharged debt, Reinhart (prudently) returned to the bankruptcy court to obtain clarity on the parties' rights and obligations. (ECF No. 2-3 at 10.) Reinhart first moved to reopen the Schlundts' bankruptcy case and then filed an adversary complaint in which it sought a declaratory judgment that the roughly $37,000 in debt arising from unpaid sales in 2018 was not subject to the Schlundts' 2014 bankruptcy discharge. (*Id.* at 2, 10.)

Reinhart moved for summary judgment, and, on March 10, 2021, the bankruptcy court heard oral argument on the motion. (ECF No. 2-5 at 1.) Reinhart's primary argument was that because Schlundt's liability for the $36,839.62 did not arise until 2018—four years after he and his wife filed their joint bankruptcy petition—the debt was not discharged under the plain terms of Section 727(b). (ECF No. 2-3 at 28-30.) Reinhart also argued in the alternative that the debt was excepted from discharge under 11 U.S.C. §523(a)(3) because the debt was not scheduled in time for Reinhart to file a proof of claim. (*Id.* at 30-31.) In opposition, Schlundt argued that because he signed the Personal Guaranty in 2003, ten years before he filed for bankruptcy, the debt should be deemed to have arisen prior to the petition date, regardless of when the unpaid sales occurred and the corresponding liability arose. (*Id.* at 46-51.) He also argued that because his was a "no-asset" case, it did not matter that he had failed to include Reinhart on his schedules for Section 523(a)(3) purposes. (*Id.* at 51-52.)

In an August 19, 2021 Decision and Order, the bankruptcy court ruled that Reinhart's claim was covered by the Schlundts' 2014 discharge. *In re Schlundt*, 2021 WL 3700401, at *7. The court noted the division of authority in the bankruptcy courts over the effect of a debtor's discharge on liabilities arising post-petition under a pre-petition personal guaranty. *Id.* at *3-4. But it concluded it was bound by the Seventh Circuit's decision in *Saint Catherine* to hold that the liability Reinhart sought to enforce was a pre-petition debt discharged in the Schlundts' 2014 bankruptcy. *Id.* at *5. Citing *In re Guseck*, 310 B.R. 400, 402-03 (Bankr. E.D. Wis. 2004), the bankruptcy court also rejected Reinhart's Section 523(a)(3) argument. *Id.* at *5-7. The bankruptcy court concluded that Reinhart's "garden variety" debt was discharged notwithstanding any

scheduling failures by the Schlundts because Reinhart had not alleged pre-petition fraud related to Schlundt's entry into the personal guaranty sufficient to take the debt outside the *Guseck* rule. (*Id.* at *5.)

Reinhart then appealed to this Court. (ECF No. 1.)

## LEGAL STANDARD

Bankruptcy court decisions are reviewed according to the same standards that govern other appeals. *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004). Thus, a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. *See Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). "As a conclusion of law, a grant of summary judgment by the bankruptcy court is therefore reviewed de novo" and "will be affirmed 'if there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *In re Midway*, 383 F.3d at 668 (quoting Fed. R. Civ. P. 56(c)). This Court "may affirm . . . on any grounds supported by the underlying record." *In re Winters*, No. 96-c-7117, 1999 WL 281083, at *11 (N.D. Ill. Mar. 31, 1999) (citing *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 n.1 (7th Cir. 1991)) (other citations omitted).

## ANALYSIS

In its appeal, Reinhart offers two challenges to the bankruptcy court's decision. First, Reinhart claims the bankruptcy court incorrectly concluded that Reinhart's $36,839.62 claim was a pre-petition debt subject to the Schlundts' 2014 discharge. Second, Reinhart contests the bankruptcy court's determination that the Schlundts' failure to schedule Reinhart as a creditor and provide it notice of their bankruptcy petition did not preclude discharge under 11 U.S.C. Section 523(a)(3). Because the first argument necessitates reversal and remand, the Court will limit its discussion to that argument.[2]

---

[2] The bankruptcy court's application of *In re Guseck* to resolve the Section 523(a)(3) argument is not without question. *Guseck* held that under "the plain language of §523(a)(3)(A), in a no-asset, no-bar-date bankruptcy case" all "garden variety debts" fall within the scope of the Section 727 discharge even if a debtor fails to schedule and provide notice to creditors. 310 B.R. 400, 402-03. While *Guseck*'s rule may be sensible as a policy matter, a more faithful reading and simpler application of the text of the Bankruptcy Code and Rules appears to require a different result. *See In re Jakubiak*, 591 B.R. 364, 380-382 (Bankr. E.D. Wis. 2018) (explaining inconsistency between *Guseck* ruling, text of Section 523(a)(3), and Bankruptcy Rules.) Because the Court concludes Schlundt's debt to Reinhart arose post-petition and was thus not discharged under Section 727(b) in any event, it need not weigh into the interpretive differences between *Guseck* and *Jakubiak*.

I. **Under the Plain Terms of the Bankruptcy Code, Schlundt's 2018 Liability Under the Personal Guaranty Is a Post-Petition Liability Not Discharged in the Schlundts' 2014 Bankruptcy.**

The dispositive question is whether a 2014 bankruptcy discharge order can extinguish a debt from the sale of goods and services in 2018 based solely on the fact that the promise to guarantee such a debt was made in 2003, prior to the bankruptcy. As with most bankruptcy issues, the analysis begins with the plain terms of the Bankruptcy Code.

Under Section 727(b), the Schlundts' bankruptcy discharge served to discharge "all debts that arose before the date of the order for relief under this chapter." 11 U.S.C. §727(b). "'[D]ebt' means liability on a claim." *Id.* §101(12). "Claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* §101(5)(A). And "the date of the order for relief" is the date on which the debtors filed their bankruptcy petition. *Id.* §§727(b); 302(a). Taken together and applied to this case, that means the Schlundts' 2014 bankruptcy discharge order extinguished all debts, but only those debts, that arose *before* January 17, 2014, the date they filed their joint bankruptcy petition.

Under the undisputed facts, the $36,839.62 debt at issue is a post-petition debt not subject to the Schlundts' 2014 discharge. Schlundt promised to personally guarantee his restaurant business' existing and future debts to Reinhart in 2003, more than ten years before the Schlundts' bankruptcy petition. (ECF No. 2-3 at 56-57.) At the time he signed the Personal Guaranty, neither Schlundt nor The Refuge owed any debt or had any liability to Reinhart; specific debts arose only when The Refuge later acquired actual goods or services under the Agreement. (*Id.* at 35.) The debt and liability at issue here arose between March and May 2018 when The Refuge acquired $36,839.62 worth of specific goods and services from Reinhart. (*Id.* at 37.) At that point, but no earlier, Reinhart had both a $36,839.62 claim against The Refuge for those goods and services and a contingent claim against Schlundt, subject to the contingency that Schlundt's liability would be triggered only if The Refuge "failed to pay." There was no debt, claim or right to payment of any kind for this $36,839.62 prior to 2018. Because the liability did not arise until four years *after* the Schlundts filed their bankruptcy petition, the debt was not subject to the Schlundts' earlier bankruptcy discharge, consistent with the plain terms of Section 727(b).

The Schlundts insist, however, that any debts associated with the guaranty, whether from credit extended before or after their bankruptcy filing, must be deemed to have arisen when

Schlundt signed the Personal Guaranty in 2003. This argument confuses a contractual "promise" with a "debt," and they are not the same thing. Most debtors enter bankruptcy having made many promises and signed many contracts. But the mere existence of a promise or a contract does not necessarily create a legal liability. Nor does a bankruptcy discharge automatically wipe away all of a debtor's pre-bankruptcy contracts or contractual promises. A debtor's discharge precludes enforcement of "debts"—not promises—that arose before the bankruptcy petition was filed. 11 U.S.C. §727(b). And, under Section 101(12), a debt exists only when there is liability on a claim. The mere existence of a promise or contractual provision does not, in and of itself, create legal liability or, accordingly, a debt. Thus, for example, a debtor who contracts for a credit card or line of credit and then files for bankruptcy will receive a discharge for any debts relating to purchases or credit draws made before the bankruptcy filing. But that same debtor is not free to go on a post-bankruptcy spending spree using that credit card or drawing on that line of credit and then have these new post-petition liabilities declared discharged. The same result applies here, where the bankrupt debtor is a guarantor of future extensions of credit, just as it would if he was the primary obligor obtaining that credit.

The $36,839.62 debt at issue stands in contrast to the $10,000 debt that existed at the time the Schlundts filed for bankruptcy. Leaving to one side the effect of the Schlundts' failure to include this debt in their bankruptcy schedules, it was an existing liability as of the petition date and thus would have been subject to their discharge. While the record is unclear whether The Refuge had already failed to pay that debt sufficient to trigger Schlundt's immediate liability under the Personal Guaranty, even if that contingency had not yet occurred, the debt would have been discharged because the Bankruptcy Code expressly recognizes that claims may be contingent. *See* 11 U.S.C. §101(5)(A).

It is also worth noting that a claim could have arisen with respect to Schlundt's Personal Guaranty if he had terminated it prior to filing for bankruptcy. Because the Personal Guaranty was "irrevocable," any termination would have been a breach. But if Schlundt had notified Reinhart he was terminating the guaranty, any liabilities arising from that breach would have been discharged as a pre-petition debt under Section 727(b). Schlundt does not suggest he made any effort to do so, (ECF No. 2-3 at 51-52), and nothing in the Bankruptcy Code provides that the mere

filing of a bankruptcy petition automatically terminates all of a debtor's existing contractual obligations.[3]

This analysis is also consistent with state law concerning continuing guaranties. Wisconsin law treats each extension of credit under a continuing guaranty as a separate liability. "A guaranty of payment for future purchases is considered a continuing offer to guarantee payment of each purchase as a separate transaction." *John Deere Co. v. Babcock*, 278 N.W.2d 885, 886 (Wis. 1979). "The offer is accepted on each successive sale." *Id.* And a party is subject to separate liabilities for breaches of those discrete transactions. *See Associates Fin. Servs. Co. v. Eisenberg*, 186 N.W.2d 272, 275 (Wis. 1971). Other courts have handled debts arising post-petition from pre-petition continuing guaranties in a similar manner. *See In re Rosenfeld*, 23 F.3d 833, 837 (4th Cir. 1994); *In re Brand*, 578 B.R. 729, 733-34 (D. Md. Sept. 19, 2017); *In re Shaffer*, 585 B.R. 224, 228-29 (Bankr. W.D. Va. 2018); *In re Jordan*, No. 04-11372-DHW, 2006 WL 1999117, at *3 (Bankr. M.D. Ala. June 15, 2006).

The Schlundts try to justify their position by characterizing the $36,839.62 debt as a liability on a "contingent" claim within the meaning of Section 101(5)(A). But this stretches the meaning of a contingent claim almost beyond recognition. As one philosophically inclined bankruptcy court has noted, every future event is contingent on a past state of affairs. *See In re CD Realty Partners*, 205 B.R. 651, 656 (Bankr. D. Mass. 1997). The election of Herbert Hoover depended on the Big Bang. Would it be fair to say that his election "arose" with the end of the primordial singularity? The real question (in bankruptcy, not cosmological physics) is at what point a right to payment, contingent though it may be, is identifiable as a legal liability. Neither the Schlundts nor The Refuge had any liability for this $36,839.62 in 2014; it was not even a glimmer on the horizon of anyone's imagination. It is likely the goods purchased had not even been manufactured yet. Accordingly, in 2014 there was no claim for this amount, contingent or otherwise, and the future debt could not have been discharged.

---

[3]  Moreover, had Schlundt notified Reinhart that he was terminating the guaranty, Reinhart would have been in a position to request that he sign a new one as a condition of it continuing to supply Schlundt's restaurant. It is a standard requirement for suppliers to require such guaranties from the owners of small, wholly owned business entities. Mark A. Tanner, *Food for Thought—The Matter of Personal Liability for Restaurant Debt*, BACON WILSON P.C. (Sept. 29, 2008), https://www.baconwilson.com/articles/food-for-thought-the-matter-of-personal-liability-for-restaurant-debt/ ("Unless the restaurant is well-financed, or the principals have a proven track record of success in the industry, it is likely that lending institutions such as banks and institutional suppliers will seek personal guarantees from the restaurant's principals.").

**II.      The Holding in *Saint Catherine* Does Not Compel a Different Result.**

The Bankruptcy Court accepted the Schlundts' position based largely on what it concluded was the holding in *Saint Catherine Hospital of Indiana, LLC v. Indiana Family and Social Services Administration*, 800 F.3d 312 (7th Cir. 2015). But the actual holding of *Saint Catherine* does not compel the result the Schlundts argue for here.

*Saint Catherine* involved an Indiana hospital that filed a Chapter 11 bankruptcy petition after receiving fee assessments under a new state scheme intended to increase Medicaid reimbursements. 800 F.3d at 313-14. The scheme was created by the Indiana legislature in April 2011 and required eligible hospitals to pay a Hospital Assessment Fee (HAF) based on their historic costs into a common fund to be used to reimburse hospitals for treating Medicaid patients. *Id.* Under the law, the Indiana Family and Social Services Administration (FSSA) assessed each hospital its HAF during a "fee period" running from July 1, 2011 to June 30, 2013, and the hospitals would then be required to pay the fee in two installments, covering the 2012 and 2013 fiscal years. *Id.* at 314. The FSSA assessed St. Catherine Hospital in Charlestown, Indiana a HAF of just over $1.1 million for fiscal year 2012 and roughly the same amount for 2013. *Id.* After billing St. Catherine for the 2012 portion of the assessment, the FSSA began collecting the amount due by withholding Medicaid reimbursements from the hospital. *Id.* Less than a month later, on June 19, 2012, the hospital filed for bankruptcy. *Id.* The FSSA continued its withholdings, notwithstanding the bankruptcy filing, and, after billing St. Catherine for the 2013 assessment, began withholding Medicaid reimbursements to satisfy that obligation too. *Id.* The hospital then filed an adversary proceeding in the bankruptcy court to enjoin the FSSA from continuing its withholding of Medicaid reimbursements, arguing that doing so violated the automatic stay under Bankruptcy Code Section 362. *Id.* at 314-15. It also sought recovery of the amounts previously withheld on grounds they were preference payments under Section 547. *Id.* at 314. The bankruptcy court agreed with the hospital on both points. *Id.* at 313. The district court affirmed these rulings, but reversed with respect to the 2013 HAF assessment, which it concluded was a post-petition debt and therefore not subject to the automatic stay. *Id.*

On appeal, the Seventh Circuit reversed, concluding that the hospital's debts to the FSSA for both the 2012 and 2013 HAF were pre-petition debts. *Id.* In reaching this conclusion, the Court of Appeals adopted the "conduct test" under which "the date of a claim is determined by the date of the conduct giving rise to the claim." *Id.* at 315. It further explained that "[t]he

determination of what conduct gives rise to a claim will vary depending on the nature of the liability, be it tort, contract, or tax." *Id.* at 316. After noting that St. Catherine's HAF liabilities did not fit neatly into any of these categories, the Seventh Circuit engaged in a lengthy discussion of the particular circumstances and nature of the debt at issue and ultimately held that the conduct giving rise to the HAF for both 2012 and 2013 took place *before* the hospital's bankruptcy petition. *Id.* at 317. The assessment was calculated according to the hospital's pre-petition cost reports and only enforceable via the pre-petition passage of a new law. *Id.* It did not matter that payment of the HAF was contingent on the hospital's post-petition continued operations; the creditor "was aware of [the exact amount of] its claims against [the debtor] . . . well before it filed for bankruptcy." *Id.* at 318. Accordingly, the FSSA's claim for the HAF was a pre-petition debt and subject to the automatic stay. *Id.* at 316-17.

Nothing in the holding of *Saint Catherine* necessitates categorizing Schlundt's debt to Reinhart as pre-petition. That case involved a unique Medicaid-reimbursement scheme, nothing like a pre-petition personal guaranty, and there was no application of the Bankruptcy Code or the conduct test to facts similar to those present here. While *Saint Catherine* required application of Section 105(a)'s definition of "claim," it did not involve the Chapter 7 discharge provision in Section 727(b) or its application in the particular setting of debts created via post-petition transactions subject to a pre-petition guaranty that the debtor had never sought to terminate. Even more fundamentally, unlike the creditor and debtor in *Saint Catherine*, neither Reinhart nor the Schlundts had any idea of the amount that would be owed to Reinhart in 2018, prior to the Schlundts' bankruptcy filing in 2014. Indeed, they could not have known because the legal liability did not exist.

In concluding that *Saint Catherine* required holding that the $36,839.62 debt owed Reinhart was a pre-petition debt, the bankruptcy court cited a number of general statements made by the Seventh Circuit in explaining its adoption of the conduct test. For example, the Court of Appeals observed that "contractual liability is *generally* thought to arise on the date a contract is signed." *Saint Catherine*, 800 F.3d at 316 (emphasis added). The bankruptcy court also cited the Seventh Circuit's instruction that "'*under most circumstances*, finding that a claim arose "at the earliest point possible" will best serve the policy goals underlying the bankruptcy process.'" *In re Schlundt*, 2021 WL 3700401, at *4 (quoting *Saint Catherine*, 800 F.3d at 317) (emphasis added). While the bankruptcy court understandably deferred to these general observations, they are not

part of the holding and do not necessitate the conclusion that Reinhart's claim, based on sales transactions four years after the petition date, was a pre-petition debt under the conduct test. It is true as a general matter that most liabilities arising under a contract will exist immediately when the contract is signed. Similarly, it will usually be the case that the Bankruptcy Code's goals will be best served by determining that a claim arose "at the earliest point possible." But neither precept compels the result reached by the bankruptcy court here.

Applying the plain text of the Bankruptcy Code and the conduct test adopted in *Saint Catherine* makes clear that the debt at issue here is a post-petition debt. Reinhart's claim depends almost entirely on post-petition conduct. At the time of the Schlundts' 2014 bankruptcy petition, the $36,839.62 legal liability to Reinhart was still years away from existing. While the Agreement and Personal Guaranty were both signed, the actual conduct giving rise to the liability had yet to occur. Schlundt's restaurant made the purchases giving rise to this liability four years later, in March through May of 2018. And similar to the debtor in *In re Rosenfeld*, 23 F.3d at 837-38, Schlundt's $36,839.62 debt arose from his restaurant's post-petition exercise of an agreement, subject to a personal guaranty that he could have "terminated at any time." *In re Brand*, 578 B.R. at 733 (citing *In re Rosenfeld*, 23 F.3d at 838); *John Deere Co.*, 278 N.W.2d at 886 (holding that each loan subject to a guaranty is a separate transaction, comprising a new offer to guarantee payment).

Legal principles aside, it also makes little sense as a policy matter to apply the conduct test in the manner the Schlundts suggest. Courts typically find that claims arise at the earliest possible moment because "there is 'little benefit' to be 'gained by allowing a person who knows it has a claim to pursue the claim outside of bankruptcy or to sit on the claim until after bankruptcy.'" *Saint Catherine*, 800 F.3d at 317-18 (quoting *In re Chicago*, 974 F.2d 775, 782 (7th Cir. 1992)). But this is not a case where Reinhart lay in wait, determined to pursue its claim at a more advantageous time. It had no right to payment to enforce. A nebulous promise (that the debtor declined to revoke or terminate before, during, or after his bankruptcy) for a sum then completely unknowable is hardly a "right to payment" that a court can account for in administering the debtor's estate. Moreover, the continued existence of the guaranty did not deny the Schlundts a "'fresh start.'" *Id.* at 317 (quoting *In re Chicago*, 974 F.2d at 782) When the Schlundts received their discharge under Section 727(b), they owed no liabilities to Reinhart. At that time, the guaranty did not obligate Schlundt to do anything. It was only later, when he affirmatively chose to have

his restaurant obtain additional credit from Reinhart that he exposed himself to liability. By choosing to purchase additional goods and services under the Agreement, he subjected himself to the promises contained therein, including his Personal Guaranty. There is nothing onerous or unfair about holding him to that bargain based on his own post-bankruptcy conduct.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the Order and Judgment of the Bankruptcy Court Granting summary judgment in favor of David and Jennifer Schlundt and denying Reinhart FoodService, LLC's motion for summary judgment is **REVERSED and REMANDED** with instructions to enter declaratory judgment in favor of Reinhart as to the enforceability of the Personal Guaranty and conduct any necessary further proceedings consistent with this Order.

Dated at Milwaukee, Wisconsin on October 27, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge